UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ADRIAN TERRY,

        Plaintiff,

v.                          Case No.: 8:18-cv-2664-T-33AAS

ROBERT WILKIE,
as Secretary of Veterans
Affairs,

        Defendant.
_____/

**ORDER**

This matter comes before the Court upon consideration of Defendant Robert Wilkie's Amended Motion for Summary Judgment (Doc. # 28), filed on October 10, 2019. Plaintiff Adrian Terry responded on October 28, 2019. (Doc. # 30). Wilkie filed a reply on November 12, 2019. (Doc. # 31). For the reasons that follow, the Motion is granted.

## I.  **Background**

Terry is a veteran with numerous disabilities, including asthma, somatic symptom syndrome, PTSD, anxiety, calcaneal spurs, plantar fasciitis, tendonitis, sleep apnea, and high blood pressure. (Doc. # 28-1 at 12:21-13:6; Doc. # 1 at 2). In 2014, Terry began working as a housekeeping aide at the James A. Haley VA Medical Center. (Doc. # 28-1 at 10:5-16).

He was later promoted to supply technician. (Id. at 10:23-11:21).

According to Terry, the supply technician job involved "tak[ing] inventory" of medical supplies using a scanner, uploading that information into the computer system for tracking inventory, "pick[ing] up [the] items, put[ting] [them] in the bin to take it back to the floor," and then "restock[ing]" items in a store area. (Id. at 11:22-12:20). The 2016 job description for the supply technician position states that it "requires" (i) "regular and recurring physical exertion (such as pulling or pushing carts weighing as much as 300 pounds and lifting items weighing up to 50 pounds)"; and (ii) "standing for periods of time as well as walking, kneeling, stooping, reaching and lifting." (Doc. # 28-31 at 5). In addition, according to the 2016 job description, the supply technician is "the on-site customer service representative of Logistics Service" and thus "has personal contacts with a variety of individuals on a daily basis." (Id. at 4-5).

In May 2016, Terry informed the VA that he was "[u]nable to repeatedly lift and stand for prolonged periods." (Doc. # 28-4 at 1). Thus, on May 20, 2016, Terry requested reassignment from the supply technician job as a reasonable

accommodation. (Doc. # 28-11). Terry's "Written Confirmation of Request of Accommodation" form states that he requested only reassignment as an accommodation (Id.), and two other forms from this time — the "Request for Medical Documentation" form Terry provided to his doctor (Doc. # 28-4 at 1) and the "Acknowledgement of Receipt of Request" form (Doc. # 31-2 at 2) — both state that Terry's requested accommodation was reassignment.

At his deposition, Terry vaguely suggested that he also sought the accommodation of a chair at this time so that he could stay in the supply technician position but was denied. (Doc. # 28-1 at 16:8-11). Specifically, when asked whether "anyone tr[ied] to figure out if there was a way [he] could still do [his] job as a supply technician with accommodations," Terry replied "No, they don't do that. . . . Because when she asked if they could help me, because the only thing I was requesting was a chair to sit, but they said no. And that's when they placed me in working as a greeter at the front desk." (Id. at 15:22-16:11).

Later in his deposition, however, Terry confirmed that he never asked for a chair as a reasonable accommodation while he was working as a supply technician in the logistics department:

Q: Did you ever ask for a chair when you were in logistics, though?
My understanding was you said that you couldn't stand for more than 20 minutes?
A: Right. But I never had a chance to ask, because when I brought my paperwork back, the chief said he didn't have nothing for me so she --
Q: Did you ever ask for a chair?
A: No. You talking about after I requested accommodation?
Q: **Initially, did you ever ask for a chair when you were in logistics?**
A: **No. No. Because I didn't know I could get a chair,** because we all -- we -- everyone was just constantly -- you know, just standing, wasn't no chair. **So, you know, I didn't think to ask for one during that time.**

(Id. at 94:4-20)(emphasis added).

While the VA looked for a permanent reassignment for him, Terry began working as an interim hospital greeter. (Doc. # 28-5 at 1; Doc. # 28-1 at 24:19-25). Then, on June 7, 2016, Terry provided additional work restrictions to the VA, including that he could stand only for twenty-minute periods. (Doc. # 28-13). Terry acknowledged at his deposition that, at the time his restrictions prevented him from standing for more than twenty minutes at a time, it would have been difficult to perform the duties of a supply technician. (Doc. # 28-1 at 18:12-25).

On June 29, 2016, the VA ran its first search for a new permanent position for Terry. (Doc. # 28-12). As a result of that search, the VA offered Terry the position of telephone

operator. (Doc. # 28-14). But Terry claimed that he needed a different reassignment because he could not work the night shifts required for that position. (Doc. # 28-15).

Meanwhile, Terry continued working as a hospital greeter. (Doc. # 28-1 at 24:19-25). The VA conducted additional searches for available reassignments for Terry in August 2016, October 2016, and January 2017, but no appropriate positions were available. (Doc. # 28-16; Doc. # 28-17; Doc. # 28-18).

Then, in March 2017, the VA offered Terry the position of medical support assistant. (Doc. # 28-19). Terry accepted the offer and completed two weeks of training. (Doc. # 28-20; Doc. # 28-1 at 25:25-26:14). The medical support assistant position primarily involved "making appointments, cancelling appointments, [and] checking patients in." (Doc. # 28-1 at 26:15-17). After his first day on the job, however, Terry told his supervisor that he could not work as a medical support assistant. (Id. at 28:10-29:4).

After taking a few days' leave, on April 24, 2017, Terry provided the VA with medical documentation stating that, because he had great difficulty multi-tasking and concentrating, he should not answer phones or schedule

appointments and should have "minimal patient interaction."
(Doc. # 28-3).

The VA responded by searching once again for vacant positions that fit Terry's restrictions. The April 2017 search revealed no available positions. (Doc. # 28-21). Meanwhile, in May 2017, Terry was moved to an interim position with the VA's Gold Stars program. (Doc. # 28-2). On May 30, 2017, the VA ran another search but found no available positions. (Doc. # 28-22). The next search on June 28, 2017, also revealed no available positions. (Doc. # 28-23). The VA's July 2017 search, which was expanded to also look for positions at the VA's Bay Pines and Orlando locations, was similarly unsuccessful. (Doc. # 28-24). The VA's August 2017 search, which was further expanded to include Miami, Gainesville, and West Palm Beach, likewise revealed no available positions consistent with Terry's restrictions. (Doc. # 28-25).

Terry contacted his EEO counselor on August 27, 2017. (Doc. # 28-26). Then, on September 8, 2017, the VA denied Terry's request for reasonable accommodation on the grounds that it was unable to "identify vacant funded positions [Terry] qualif[ied] for that me[t] [his] restrictions and [were] not a promotion." (Doc. # 28-27 at 2). On September

18, 2017, Terry met with the reasonable accommodation specialist and HR specialist, as well as two union representatives, to discuss his accommodation request. (Doc. # 28-26 at 2). Terry testified that one of the union representatives gave him the idea to ask for a chair as a reasonable accommodation:

> Q: So who gave you the idea to ask for a chair?
> A: The union when we was — during our meeting they would suggest, Well, if he can't stand for so long, then why not give him a chair? They was suggesting that, for me to go back to logistics given the fact that was my only issue, standing.

(Doc. # 28-1 at 95:2-7). Two days later, Terry filed a complaint for disability discrimination and retaliation with the VA. (Doc. # 28-26 at 1).

On September 27, 2017, VA representatives met with Terry to discuss the denial of his reasonable accommodation request. (Doc. # 28-27 at 2). At that meeting, Terry provided the VA with his updated medical restrictions, including that he could stand for 2 hours as long as he then could sit for 30 minutes to an hour. (Id.; Doc. # 28-28). Importantly, however, Terry's other restrictions, including that he focus only on one task at a time and have minimal patient interaction, did not change. (Doc. # 28-27 at 2).

During that meeting, Terry asked to be reassigned to the supply technician position with a chair as a reasonable accommodation. (Doc. # 28-1 at 95:2-9). Notably, between Terry's leaving the position of supply technician in 2016 and his request to be reassigned to that position with a chair in September 2017, the job description for supply technician had been updated. (Doc. # 31-3). The 2017 job description explains that the job "requires standing and walking during the entire workday, and frequent reaching, bending and lifting of supply packages (occasionally weighing as much as 50 pounds)." (Id. at 7). Additionally, according to the updated job description, the supply technician position's duties include (i) "general telephone inquiries and visitor referrals"; (ii) "communicating with customers and vendors to obtain information regarding medical supplies"; and (iii) "providing information as needed in response to general telephone inquiries and visitor referrals." (Id. at 4, 6). The job description also states that "[w]ork is performed on established shifts, which may involve evening, overnight, or weekend hours." (Id. at 4).

Nevertheless, Terry testified that he could have done the job of supply technician with only a chair as an accommodation because "the only thing [he] was needing [was]

just to sit down more." (Doc. # 28-1 at 16:12-15). Yet Terry also stated: "with that job you're constantly on your feet, you never really sit unless you're going on break, because everything consists of standing and or bending or whatever." (Id. at 16:15-18).

Moreover, although he acknowledged that the supply technician position required repeated lifting, Terry averred during his deposition that he could perform the required lifting despite the medical restriction. (Id. at 95:15-97:16). Terry acknowledged that he would have to lift supplies from shelves to put onto his cart, and then lift the supplies back up to put on the destination shelf. (Id. at 97:11-16). According to Terry, however, this repeated lifting was not a problem because the supplies usually were not heavy. (Id. at 95:15-96:7). Also, Terry's cart had four bins and he usually "put[] [his] supplies in these bins" and "just push[ed] the bin and push[ed] the bin inside the work and just work[ed] off my bin." (Id. at 96:7-18). Terry insisted: "It's not really lifting. The only thing I'm lifting is the empty bin to put on my cart. That's it. The bin could just sit there." (Id. at 95:15-96:18). Terry admitted, however, that he would usually have to lift these bins four times a day. (Id. at 96:19-97:10).

Still, Terry testified that the lifting done in the supply technician position was no more intense than that done during grocery shopping. (Id. at 126:18-127:5). And Terry suggested that he was capable of that level of lifting at the time he requested to be reassigned to the supply technician position with a chair as a reasonable accommodation. (Id.).

Additionally, Terry admitted during his deposition that the supply technician position required him to multi-task. (Id. at 65:24-66:5). Nevertheless, Terry maintained that the level of multi-tasking required in the supply technician position was much lower than in the medical support assistant position, so he was able to "work at [his] own pace." (Id. at 66:7-17). Terry also admitted that he was sometimes assigned to answering the telephone in the supply technician position. (Id. at 66:18-67:14). Terry nevertheless maintained that he could have performed the necessary functions of the supply technician position with the reasonable accommodation of a chair. (Id. at 127:6-128:10).

On October 2, 2017, the VA upheld its denial of Terry's reasonable accommodation request because no position was available that Terry could perform with his restrictions. (Doc. # 28-27). The VA issued a proposed removal letter to

Terry on October 24, 2017. (Doc. # 28-29). The letter stated, in relevant part:

> You did not identify any accommodation which might make it possible to perform the essential functions of your currently assigned position and the Agency has not been able to identify any. The Agency has also diligently searched for an additional position to which it might reassign you as another reasonable accommodation, but none was found.

(Id. at 1). The letter also stated that the "ninety-day position search period ended on July 28, 2017," which Terry interprets as meaning that no additional search for an available position was performed after Terry's medical restrictions were updated on September 27, 2017. (Id. at 2).

Terry attended a meeting with VA representatives on October 31, 2017, to discuss his removal from employment with the VA. (Doc. # 28-30). Despite the meeting, Terry was removed from federal service on November 20, 2017. (Id.).

Terry initiated this case against Wilkie on October 30, 2019, asserting claims for disability discrimination (Count I) and retaliation (Count II) under the Rehabilitation Act, and disability discrimination (Count III) and retaliation (Count IV) under the Americans with Disabilities Act (ADA). (Doc. # 1). Wilkie filed his Answer on February 4, 2019. (Doc. # 11). The case proceeded through discovery. The parties

mediated on September 4, 2019, but reached an impasse. (Doc. # 24).

Now, Wilkie moves for summary judgment on all claims. (Doc. # 28). Terry has responded (Doc. # 30), and Wilkie has replied. (Doc. # 31). The Motion is ripe for review.

## II. **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996)(citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are

no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995)(quoting Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only

proper, but required. <u>Morris v. Ross</u>, 663 F.2d 1032, 1034

(11th Cir. 1981).

## III. <u>Analysis</u>

Wilkie advances three separate arguments for summary

judgment. The Court will address each in turn.

### A. <u>ADA Claims</u>

First, Wilkie argues that summary judgment should be

granted on Terry's ADA claims for disability discrimination

(Count III) and retaliation (Count IV) because the

Rehabilitation Act provides the exclusive remedy for federal

employees challenging workplace discrimination based on

disability. (Doc. # 28 at 8).

The Court agrees. It is black-letter law that "the

Rehabilitation Act . . . provides the exclusive remedy for

federal government employees seeking damages and relief for

work-place discrimination based on disability." <u>Lapar v.

Potter</u>, 395 F. Supp. 2d 1152, 1157 (M.D. Fla. 2005); <u>see also

Rio v. Runyon</u>, 972 F. Supp. 1446, 1454 (S.D. Fla. 1997)("As

a federal employee, Plaintiff's exclusive remedy for alleged

disability discrimination in connection with her employment

is the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§

791, 794, and 794a."). Notably, Terry failed to address this

argument in his response.

Thus, the Motion is granted as to Counts III and IV.

**B.    Disability Discrimination Claim**

"The Rehabilitation Act [] prohibits federal agencies from discriminating in employment against otherwise qualified individuals with a disability." Dickerson v. Sec'y, Dep't of Veterans Affairs Agency, 489 F. App'x 358, 359 (11th Cir. 2012)(citation omitted). Title VII's burden-shifting analysis applies under the ADA, Earl v. Mervyns, Inc., 207 F.3d 1361, 1365 (11th Cir. 2000), and ADA standards apply to the Rehabilitation Act. 29 U.S.C. § 794(d). Thus, in analyzing Terry's Rehabilitation Act claims, the Court looks to case law decided under both the ADA and the Rehabilitation Act. See Dickerson, 489 F. App'x at 360 n.2 ("[C]ases decided under the ADA and the Rehabilitation Act may be used interchangeably.").

To succeed on a disability discrimination claim, a plaintiff must first establish a prima facie case. Once a prima facie case is established, the defendant must show a legitimate, non-discriminatory reason for the conduct, Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577-78 (1978), which the plaintiff can overcome with evidence of pretext, Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).

15

### 1.  **The Prima Facie Case**

Wilkie argues that the Court should grant summary judgment on Terry's disability discrimination claim under the Rehabilitation Act because Terry has not established a prima facie case. (Doc. # 28 at 11).

The Rehabilitation Act prohibits employers from discriminating against "qualified individual[s] on the basis of disability." 42 U.S.C. § 12112(a). "[T]o establish a prima facie case of discrimination under the [Act], [the plaintiff] must demonstrate that [he] (1) is disabled, (2) is a qualified individual, and (3) was subjected to unlawful discrimination because of [his] disability." Cash v. Smith, 231 F.3d 1301, 1305 (11th Cir. 2000); see also Holly v. Clairson Indus., L.L.C., 492 F.3d 1247, 1255-56 (11th Cir. 2007).

A "qualified individual" is a person who, with or without reasonable accommodations, is able to perform the essential functions of the job he holds or desires. 42 U.S.C. § 12111(8). "[A] plaintiff must show either that he can perform the essential functions of his job without accommodation, or, failing that, show that he can perform the essential functions of his job with a reasonable accommodation." D'Angelo v. ConAgra Foods, 422 F.3d 1220, 1229 (11th Cir. 2005)(quotation marks omitted). "And even a 'relative[ly] infrequen[t]'

inability to perform a job's essential functions is enough to render a plaintiff not a 'qualified individual' under the ADA." Billups v. Emerald Coast Utils. Auth., 714 F. App'x 929, 936 (11th Cir. 2017)(quoting Holbrook v. City of Alpharetta, 112 F.3d 1522, 1528 (11th Cir. 1997)).

"An employer unlawfully discriminates against a qualified individual with a disability when the employer fails to provide 'reasonable accommodations' for the disability — unless doing so would impose undue hardship on the employer." Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1255 (11th Cir. 2001)(quoting Davis v. Fla. Power & Light Co., 205 F.3d 1301, 1305 (11th Cir. 2000)). Still, "the duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made." Gaston v. Bellingrath Gardens & Home, Inc., 167 F.3d 1361, 1363 (11th Cir. 1999). "Where the employee fails to identify a reasonable accommodation, the employer has no affirmative duty to engage in an 'interactive process' or to show undue hardship." Spears v. Creel, 607 F. App'x 943, 948 (11th Cir. 2015).

An "employer is not required to accommodate an employee in any manner in which that employee desires." Terrell v. USAir, 132 F.3d 621, 626 (11th Cir. 1998)(citation omitted). "The plaintiff bears the burden of identifying an

accommodation, and of demonstrating that the accommodation allows him to perform the job's essential functions." Lucas, 257 F.3d at 1255-56.

Indeed, "[a]n accommodation can qualify as 'reasonable,' and thus be required by the ADA, only if it enables the employee to perform the essential functions of the job." Id. at 1255. "An accommodation that simply eliminates, rather than enables the disabled employee to perform, an essential function of their job is 'per se unreasonable.'" Leme v. S. Baptist Hosp. of Fla., Inc., 248 F. Supp. 3d 1319, 1345 (M.D. Fla. 2017). "The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires." Dickerson, 489 F. App'x at 360 (quoting 29 C.F.R. § 1630.2(n)(1)). "Whether a function is essential is evaluated on a case-by-case basis by examining a number of factors." Id. (citation omitted). "Consideration is given to the employer's judgment as to what functions of a job are essential." Id.

"[T]he ADA may require the employer to 'reassign,' i.e., transfer, the disabled employee to a vacant position as a reasonable accommodation. The reassignment duty, however, does not require the employer to bump another employee from

a position in order to accommodate a disabled employee. Nor does it require the employer to promote a disabled employee." Lucas, 257 F.3d at 1256 (citations omitted).

## 2. Discussion

According to Wilkie, Terry cannot show that "he was qualified as either a Supply Technician or Medical Support Assistant because he could not perform the essential functions outlined in the respective job descriptions" or that "he was discriminated against because the United States failed to reassign him." (Doc. # 28 at 11).

Wilkie argues that Terry could not perform the essential functions of the supply technician position because of his "restrictions on walking, standing, repeated lifting, multitasking, answering the phone, and interacting with patients." (Id. at 12). Wilkie relies on both the 2016 and 2017 official job descriptions for the supply technician position to establish that standing, repeated lifting, multi-tasking, interacting with others, and answering phones were all essential functions of that position. See 42 U.S.C. § 12111(8) ("[C]onsideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this

description shall be considered evidence of the essential functions of the job.").

Wilkie also argues that Terry's medical restrictions prevented him from performing the essential functions of four other positions — medical support assistant, mail clerk, human resources assistant, and time and leave clerk. (Doc. # 28 at 12-14).

In response, Terry argues that he was qualified to hold the position of supply technician with the reasonable accommodation of a chair. (Doc. # 30 at 8). But Terry makes no claim, and presents no evidence, regarding the four other positions. Thus, Terry has abandoned any argument that he could have held the positions of medical support assistant, mail clerk, human resources assistant, and time and leave clerk. See Simpson v. Bank of Am., N.A., No. 1:07-CV-771-BBM, 2008 WL 11416950, at *6 (N.D. Ga. Feb. 20, 2008)("The Simpsons allege that BOA intentionally inflicted emotional distress on them in their Complaint. However, in their Response Brief to BOA's Motion for Summary Judgment, they discuss no law or facts that would support such a claim. Accordingly, the court deems the claim for intentional infliction of emotional distress to be abandoned."). Because Terry maintains only that he could have performed the supply technician position

with a reasonable accommodation, the Court will confine its analysis to that position.

Regarding the supply technician position, Terry argues he

> has presented evidence of the following: 1) that he presented his medical restriction note to the VA []; 2) that after he requested a reasonable accommodation, nobody tried to figure out if there was a way he could still perform his job as a supply technician while using a chair []; 3) that rather than accommodate Mr. Terry in his position as a supply technician, Andrea Dankic placed him as a greeter at the front desk. []; and 4) That the only thing Mr. Terry needed in order to complete his job as a Supply Technician was to sit down more. . . . Considering the above, Mr. Terry has presented enough evidence to establish a prima facie case for failure to accommodate under The Rehabilitation Act, 29 U.S.C. §§ 791, 794, and 794(a).

(Doc. # 30 at 10).

In short, Terry insists that the VA discriminated against him by moving him in 2016 from the supply technician position to the interim hospital greeter position and then the medical support assistant position. (Id. at 10). According to Terry, the VA should have accommodated him while he was a supply technician by "figur[ing] out if there was a way he could still perform his job as a supply technician while using a chair." (Id.).

Thus, Terry's argument hinges entirely on the assertion that he should have been provided a chair as a reasonable

accommodation back in 2016 when he was a supply technician. But Terry did not request a chair as a reasonable accommodation in 2016. True, early in his deposition, Terry vaguely suggested that he had requested a chair in 2016. (Doc. # 28:1 at 15:22-16:11). But later, when he was squarely asked whether he requested a chair while working as a supply technician, Terry testified clearly that he did not request a chair. (Id. 94:4-94:20). Specifically, when asked whether he "ever ask[ed] for a chair when [he] [was] in logistics," meaning his job as a supply technician, Terry stated: "No. No. Because I didn't know I could get a chair, because we all — we — everyone was just constantly — you know, just standing, wasn't no chair. So, you know, I didn't think to ask for one during that time." (Id. at 94:14-20). Immediately afterwards, Terry was asked "who gave [him] the idea to ask for a chair," and he replied "[t]he union when we was — during our meeting," meaning the September 2017 meeting attended by Terry's union representatives. (Id. at 95:2-3; Doc. # 28-26 at 2).

This internally contradictory deposition testimony is insufficient to create a genuine dispute of material fact about whether Terry asked for a chair as a reasonable accommodation in 2016 when he was a supply technician. See Watson v. Forest City Commercial Mgmt., Inc., No. 1:13-CV-

3919-LMM, 2014 WL 11281384, at *1 n.1 (N.D. Ga. Dec. 16, 2014)("Plaintiff contends in her Statement of Material Facts, that a genuine issue of fact exists as to how long the incident lasted by pointing to deposition testimony that Plaintiff was asked 'Do you know how long were [sic] you fighting approximately?' and she responded 'No, sir.' That testimony contradicts Plaintiff's earlier deposition testimony, in which she agreed '[the fight] was over in an instant,' and 'it [was] just a matter of seconds.' This Court disregards Plaintiff's testimony that she did not know how long the fight lasted."), aff'd, 618 F. App'x 584 (11th Cir. 2015); Carytown Jewelers, Inc. v. St. Paul Travelers Cos., Inc., No. 3:06CV312, 2007 WL 174020, at *7 (E.D. Va. Jan. 18, 2007)(finding that a deponent who "contradicted the same assertion in the same deposition. . . . may not create a genuine issue of material fact by presenting two conflicting versions of events"); Tang v. Jinro Am., Inc., No. CV-03-6477 (CPS), 2005 WL 2548267, at *4 (E.D.N.Y. Oct. 11, 2005)("In his deposition testimony, Plaintiff states both that he signed the agreement, and that he did not sign the agreement. Such inconsistency is not sufficient to create a 'genuinely disputed' issue of fact if only because a statement against one[']s interest trumps one which is self-serving."). Indeed,

the contemporaneous documentary evidence suggests that the only reasonable accommodation Terry requested in 2016 was reassignment to a different position. (Doc. # 28-11; Doc. # 28-4 at 1; Doc. # 31-2 at 2).

As a fallback, Terry argues that the VA should have engaged in more of an "interactive process" with him in 2016 to reveal alternative reasonable accommodations besides reassignment. (Doc. # 30 at 13-14). The Court is unpersuaded. The Eighth and Ninth Circuit case law cited by Terry is not binding on this Court. Still, Terry is correct that "[t]he [ADA] regulations state that an employer may in some circumstances need to 'initiate an informal, interactive process' with a disabled employee to determine the appropriate reasonable accommodation." Frazier-White v. Gee, 818 F.3d 1249, 1257 (11th Cir. 2016) (citing 29 C.F.R. § 1630.2(o)(3)). Here, however, the only reasonable accommodation Terry requested was reassignment, and the VA gave him that exact accommodation. The VA did not fail to engage in an interactive process with Terry by giving him the reasonable accommodation he actually requested in 2016. See Knight v. Gen. Telecom, Inc., 271 F. Supp. 3d 1264, 1286 (N.D. Ala. 2017)(granting summary judgment to the defendant where "[t]he Plaintiff [did] not argue that he requested any

accommodation which was denied" and "it [was] undisputed that the Plaintiff was never denied any breaks (the accommodation he requested) either before he formally requested them, or after").

Moreover, even if Terry had requested a chair as a reasonable accommodation in 2016, there is no genuine issue of material fact as to whether a chair would have enabled Terry to perform the essential functions of the supply technician position. First, Terry acknowledged that it would be difficult to do the job of supply technician when he could only stand for twenty-minute periods — his medical restriction on standing in 2016. (Doc. # 28-1 at 18:12-25; Doc. # 28-13). Second, the supply technician position required — as set out in the job description — repeated lifting (Doc. # 28-31 at 5), and Terry's medical restrictions from 2016 expressly stated that he should not hold a position that required repeated lifting. (Doc. # 28-4 at 1). While Terry tried in his deposition to downplay the importance of repeated lifting for this position, he nevertheless acknowledged that lifting supplies and bins multiple times a day was part of the job. (Doc. # 28-1 at 95:15-97:16).

In any event, Terry's subjective opinion of his ability is simply irrelevant here. The VA was entitled to rely on the

medical restrictions provided by Terry's physician in determining whether he could perform the essential functions of his — or other — jobs. See Alexander v. Northland Inn, 321 F.3d 723, 727 (8th Cir. 2003)("But Northland was entitled to rely and act upon the written advice from Alexander's physician that unambiguously and permanently restricted her from vacuuming. In this situation, the employee's belief or opinion that she can do the function is simply irrelevant. The ADA does not require an employer to permit an employee to perform a job function that the employee's physician has forbidden."). To require the VA to ignore the medical restriction on repeated lifting because Terry believed he could perform the lifting required in the supply technician position "would trap [the VA] between the Scylla of liability for following medical advice and the Charybdis of different liability for ignoring the same." McQueen v. AirTran Airways, Inc., No. 3:04-CV-00180-RS-EMT, 2005 WL 3591100, at *4 (N.D. Fla. Dec. 30, 2005). A chair would not have altered the lifting requirements of the supply technician position and thus was not a reasonable accommodation as a matter of law for Terry's medical restrictions in 2016.

Finally, to the extent Terry could be interpreted as arguing that the VA also discriminated against him in 2017 by

failing to reassign him from the medical support assistant position back to the supply technician position with a chair as a reasonable accommodation, there is no genuine issue of material fact either. As an initial matter, Terry points to no evidence that a supply technician position was vacant in 2017 when he requested reassignment from the medical support assistant position. Without any evidence to show that such a position was available, no reasonable fact finder could find that Wilkie discriminated against Terry by not reassigning him from the medical support assistant position to the supply technician position with a chair as a reasonable accommodation. See Lucas, 257 F.3d at 1257 ("Because there was no vacancy at the Marietta Boulevard facility for Customer Service Representative, reassigning Lucas to that position would have required Grainger to bump another employee from it, and that is not required by the ADA."); Dempsey v. Dekalb County, No. 1:98CV3130-TWT, 2000 WL 33300667, at *8 (N.D. Ga. Mar. 17, 2000)("In order to establish his *prima facie* case of Defendants' failure to reassign him, Mr. Dempsey must point to a particular **vacant** position for which he was qualified, but to which he was not reassigned." (emphasis added)); Richardson v. Honda Mfg. of Ala., LLC, 635 F. Supp. 2d 1261, 1279 (N.D. Ala. 2009)("[R]egardless of whether Richardson

could perform the essential functions of the sit-down tugger position as characterized by McDaniel, HMA is correct that, factually, the record does not substantiate the existence of an open sit-down tugger position.").

Even if a supply technician position were vacant, a chair was not a reasonable accommodation as a matter of law for Terry to perform the supply technician position in September 2017. True, Terry's updated 2017 medical restriction allowed him to stand for two hours (up from twenty minutes in 2016) and would have allowed him to perform one essential function of the supply technician position — standing — with the reasonable accommodation of a chair. But he was still subject to the medical restriction stating that he should not perform repeated lifting, regardless of the weight of the objects being lifted. (Doc. # 28-4 at 1; Doc. # 28-27 at 2). As discussed above, the VA was entitled to rely on this medical restriction — regardless of whether Terry thought he could handle the lifting required — in determining whether he was qualified to work as a supply technician. See Alexander, 321 F.3d at 727 ("[T]he employee's belief or opinion that she can do the function is simply irrelevant. The ADA does not require an employer to permit an employee to perform a job function that the employee's physician has forbidden.").

Additional restrictions on Terry's ability to work had also been added in 2017; unlike when he first worked as a supply technician in 2016, Terry was restricted from working in any position that required multi-tasking, answering phones, or patient interaction in 2017. (Doc. # 28-3). While Terry downplayed the amount of multi-tasking and answering phones done as a supply technician during his deposition, he still acknowledged that answering phones at least occasionally was one of his duties and some degree of multi-tasking was required. (Doc. # 28-1 at 65:24-67:14). The 2017 job description for supply technician bears out that supply technicians must be able to answer phones and interact with vendors or patients as an essential function of their jobs. (Doc. # 31-3 at 4, 6).

Thus, Terry's deposition testimony does not alter this Court's decision. Terry's argument essentially boils down to the contention that the VA should have ignored the literal meaning of the medical restrictions Terry's doctors reported, as well as the VA's own job description for the supply technician position. Instead, Terry argues, the VA should have credited his belief that the medical restrictions outlined by his doctors — including not repeatedly lifting objects of any weight or answering phones or interacting with

patients — did not actually preclude him from performing a job that, by his own admission, involved at least some repeated lifting and occasional answering of phones and interacting with individuals. This does not create a genuine issue of material fact. <u>Alexander</u>, 321 F.3d at 727; <u>see also</u> <u>McQueen</u>, 2005 WL 3591100, at *4 ("AirTran was not required to ignore the physician's recommendation, nor would it have been reasonable for AirTran to have done so. To require AirTran to ignore such a restriction 'would trap employers between the Scylla of liability for following medical advice and the Charybdis of different liability for ignoring the same.'" (citation omitted)).

There are no genuine issues of material fact regarding whether Terry can establish a prima facie case of disability discrimination under the Rehabilitation Act. Therefore, the Court grants summary judgment on Count I of the Complaint.

### C. <u>Retaliation Claim</u>

"To establish a claim of retaliation under [the Rehabilitation Act], a plaintiff must prove that he engaged in statutorily protected activity, he suffered a materially adverse action, and there was some causal relation between the two events." <u>Goldsmith v. Bagby Elevator Co.</u>, 513 F.3d 1261, 1277 (11th Cir. 2008); <u>see</u> <u>also</u> <u>Holbrook</u>, 112 F.3d at

1526 n.2 (explaining that the same prima facie case analysis applies to both ADA and Rehabilitation Act claims).

Wilkie seeks summary judgment on Terry's retaliation claim under the Rehabilitation Act. (Doc. # 28 at 15). According to Wilkie, Terry "seeks to reclothe his discrimination claim as retaliation, [which] the Eleventh Circuit has prohibited." (Id.). Because Terry does not address this argument in his response (Doc. # 30), he has abandoned his retaliation claim. See Simpson, 2008 WL 11416950, at *6 ("The Simpsons allege that BOA intentionally inflicted emotional distress on them in their Complaint. However, in their Response Brief to BOA's Motion for Summary Judgment, they discuss no law or facts that would support such a claim. Accordingly, the court deems the claim for intentional infliction of emotional distress to be abandoned.").

In any event, the Court agrees with Wilkie that Terry has not proffered any evidence to support a prima facie case of retaliation. Instead, Terry is merely relying on evidence regarding alleged disability discrimination to try to establish a retaliation claim. This is impermissible. See Lucas, 257 F.3d at 1261 ("Lucas also contends [in his retaliation claim] that Grainger took adverse action against

him by failing to reasonably accommodate him, by refusing to maintain him on light duty work, and by failing to engage him in an interactive process. But this contention merely reclothes Lucas' ADA discrimination claim, which we have already rejected, and it fares no better in this garb.").

Accordingly, the Court grants summary judgment on Count II of the Complaint.

## IV.    Conclusion

Wilkie's Amended Motion for Summary Judgment is granted. Summary judgment is granted on all of Terry's claims under the ADA and the Rehabilitation Act.

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

(1)    Defendant Robert Wilkie's Amended Motion for Summary Judgment (Doc. # 28) is **GRANTED.**

(2)    The Clerk is directed to enter judgment in favor of Defendant Robert Wilkie and against Plaintiff Adrian Terry on all counts of the Complaint.

(3)    Thereafter, the Clerk is directed to **CLOSE** this case.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 21st day of November, 2019.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE